# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
June 18, 2013 Session

## STATE OF TENNESSEE v. REBA NELL WOODS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1000     Mark J. Fishburn, Judge**

**No. M2012-01922-CCA-R3-CD - Filed December 9, 2013**

A Davidson County Criminal Court Jury convicted the appellant, Reba Nell Woods, of three counts of selling twenty-six grams or more of cocaine within 1,000 feet of a school, a Class A felony, and two counts of selling twenty-six grams or more of cocaine within 1,000 feet of a park, a Class B felony. The trial court sentenced her as a Range III, career offender to an effective sentence of ninety years. On appeal, the appellant contends that the trial court erred by refusing to sever the offenses, that the evidence is insufficient to support the convictions, and that the trial court committed numerous reversible errors regarding the admissibility of evidence. Upon review, we conclude that the trial court erred by failing to sever the offenses and that the error was not harmless as to the appellant's convictions in counts 3, 4, and 5. Therefore, those convictions are reversed, and the case is remanded to the trial court for new trials on those charges. We also conclude that although the evidence is sufficient to show that the appellant sold twenty-six grams or more of cocaine in counts 1 and 2, the evidence is insufficient to show that she did so within 1,000 feet of a park. Therefore, the case is remanded to the trial court for correction of those judgments. Finding no errors that warrant reversal of the appellant's convictions for selling twenty-six grams or more of cocaine in counts 1 and 2, those convictions are affirmed. However, upon remand, the trial court is to consider whether the appellant's mandatory thirty-year sentences should be served consecutively.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part, Reversed in Part, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Kevin McGee (on appeal) and Joshua Brand (at trial), Nashville, Tennessee, for the appellant, Reba Nell Woods.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rachel Sobrero, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

In April 2010, the Davidson County Grand Jury indicted the appellant in counts 1 and 2 for selling twenty-six grams or more of cocaine within 1,000 feet of a preschool, child care agency, public library, recreational center, or park and in counts 3, 4, and 5 for selling twenty-six grams or more of cocaine within 1,000 feet of a school. At the appellant's June 2011 trial, Deputy Tim Miller of the Bedford County Sheriff's Department and the Assistant Director of the Seventeenth Judicial District Drug Task Force testified that on April 15, 2009, police officers arrested Ernest Bowens, a "low-level [drug] dealer" who was the target of a crack cocaine investigation. Deputy Miller said that after the arrest, he spoke with Bowens, and Bowens claimed to be able to purchase large amounts of cocaine from a woman in Nashville named Reba Woods. Deputy Miller, who did not know Woods, contacted Sergeant Troy Donegan of the Metropolitan Nashville Police Department (MNPD) and reported the name to him. Sergeant Donegan immediately recognized the name. On April 17, 2009, Bowens made a controlled telephone call to Woods and asked to buy cocaine. After the call, Deputy Miller contacted a police officer at the MNPD, traveled with Bowens to Nashville, and met with Nashville officers. At that point, Deputy Miller turned over the investigation to them. On April 24, 2009, Deputy Miller met with Bowens again. Bowens made a controlled call to Woods, traveled with Deputy Miller to Nashville, and made another controlled call to Woods in the presence of MNPD officers.

On cross-examination, Deputy Miller testified that he had never worked with Bowens prior to Bowens's arrest on April 15. Bowens volunteered to help Deputy Miller because Bowens was facing three felony drug charges. After Bowens helped law enforcement in this case, officers arrested him again for selling crack cocaine. Deputy Miller acknowledged that Bowens had been arrested for selling cocaine as recently as February 2011.

On redirect examination, Deputy Miller testified that Bowens was not paid for his assistance. Bowens told Deputy Miller that Woods's nickname was "Ree-Ree."

David Kline of the Metropolitan Nashville Planning Commission testified that he managed the city's Mapping Division. At the request of the district attorney's office, Kline prepared a map on February 15, 2011, using his department's "enterprise database system." The mapped area included the intersection of Lena Street and Clifton Avenue and the

-2-

intersection of 24th Avenue North and Meharry Boulevard. Kline discovered that a school and a park were within the requested area and created a 1,000-foot "buffer" around each one. He determined that the the intersection of Lena Street and Clifton Avenue was within 1,000 feet of McKissack Park and that the intersection of 24th Avenue North and Meharry Boulevard was within 1,000 feet of Pearl-Cohn High School. He also determined that the following residences were within 1,000 feet of the high school: 2210 Albion Street, 2102 Hermosa Street, and 1105 25th Avenue North. The State introduced the map into evidence as exhibit 1.

On cross-examination, Kline testified that he used computer software to measure the distances; he did not measure them personally in the field. He said that, but for the high school's baseball field, the homes at 2210 Albion Street and 2102 Hermosa Street may not have been within 1,000 feet of the high school.

Detective Kevin Guyton of the MNPD testified that in April 2009, he worked for the department's West Crime Suppression Unit and became the case officer for the department's investigation of "Reba Woods." He said that from 2001 to 2007, he had worked as a patrol officer in the "28th Avenue, Clifton, Lena, Joe Johnston and Andrew Jackson home areas." During that time, he came into contact with Woods on "many occasions," usually in front of Ben Miller's house, and became familiar with her voice. He said that she was "usually loud" and that she would "start to stutter" when she was around police officers. Detective Guyton identified the appellant in court as Reba Woods.

Detective Guyton testified that on April 15, 2009, Sergeant Donegan notified him that a confidential informant (CI) possibly could buy crack cocaine from a female named Reba. On April 17, Deputy Tim Miller of the Seventeenth Judicial District Drug Task Force and Ernest Bowens, the CI, made a controlled call to Reba. Later that day, Deputy Miller and Bowens came to Nashville. Deputy Miller had never dealt with Reba before, and he played a recording of the call for Detective Guyton. Detective Guyton recognized Reba's voice as that of the appellant and had Bowens make another controlled call to Reba. Again, Deputy Guyton recognized Reba's voice as that of the appellant. The State played both of the recorded calls for the jury. During the first call, a woman answered, and Bowens asked her, "Hey what's up with you Ree-Ree?" He told her that he wanted to buy "a whole one," and she asked if he wanted it "hard" or "soft." Bowens answered, "I want it hard." Ree-Ree told him that it would cost $1,200. Bowens said he only had $1,100, and she said, "Alright." He told her that he would arrive in Nashville in about forty-five minutes and that he would call her when he got there. During the second call, Bowens asked Ree-Ree, "[W]here you want me to come to?" Ree-Ree told him to go to Ben Miller's house and that "[s]he gonna bring the [scale] with her baby." Detective Guyton pointed out Miller's house on exhibit 1 and said that "it's two houses down from the corner, right off Clifton on Lena."

Detective Guyton testified that he put a "wire" on Bowens, gave him $1,100, and searched him and his car for drugs. Detective Guyton followed Bowens to Miller's house, parked across the street, and saw a woman, whom he recognized as the appellant, standing on the corner of Clifton and Lena. The appellant and another female, later identified as Katrina "Tina-Baby" Begley, walked to the passenger side of Bowens's car. Begley got into the front passenger seat while the appellant leaned down and acknowledged Bowens. Detective Guyton listened to Begley conduct the drug transaction with Bowens while the appellant stood by the car, "overseeing" the transaction. When the transaction was complete, Begley got out of the car, and she and the appellant walked toward Clifton Avenue. Detective Guyton followed Bowens back to their previous location and recovered a white, rock-like substance that field-tested positive as cocaine. He searched Bowens and Bowens's car again for drugs or contraband but did not find anything. The State played the audio recording of the drug sale for the jury. During the transaction, Begley weighed the cocaine for Bowens, and he counted out fifty-five twenty-dollar bills for her.

Detective Guyton testified that a second controlled buy occurred on April 24 but that he was not involved in the buy. Nevertheless, the State played the audio-recorded calls Bowens made to Ree-Ree to set up the buy, and Detective Guyton identified Ree-Ree's voice as that of the appellant.

Detective Guyton testified that on May 1, 2009, a third controlled drug buy occurred. First, Bowens telephoned the appellant. The State played the audio-recorded call for the jury during which Bowens told Ree-Ree that he wanted "two more whole ones" and that he would be there in about fifteen minutes. Ree-Ree told him that she would "get [him] ready" and asked, "You know where Pearl Cohn . . . is?" Bowens said yes, and Ree-Ree told him, "[J]ust call when you get by the ball field." Detective Guyton put a wire on Bowens, searched him and his car, gave him $2,200 to purchase two ounces of crack cocaine, and followed him to 24th Avenue North near Meharry. There, Bowens picked up Ruby Lee Murphy, who directed him to a home at 2210 Albion Street. Murphy told Bowens to go into the house. Bowens went inside with Murphy, and Detective Guyton listened as Bowens bought cocaine from her. When Bowens came out of the house, Detective Guyton followed him back to their original location. Bowens turned over the drugs, and Detective Guyton searched him and his car. The State played a recording of the drug transaction for the jury. During the transaction, Bowens counted out the money for Murphy. After the transaction, he telephoned Ree-Ree and told her, "I already picked up and dropped the money off."

Detective Guyton testified that on May 15, the same scenario occurred. Bowens made a recorded call to the appellant, and the State played the call for the jury. During the call, Bowens told Ree-Ree that he wanted "two of them big ones" but that he was not going into another house. Ree-Ree told him, "That was old dumb ass, listen, listen, that was old dumb

-4-

ass Ruby. Tina-Baby back now." Detective Guyton put a wire on Bowens, searched him and his car, gave him $2,200, and followed him to 24th Avenue North near Meharry where he had picked up Ruby Murphy on May 1. Detective Guyton said the location was "right next to Pearl-Cohn High School." Katrina Begley got into Bowens's car and told him to drive around the block. Bowens turned onto Hermosa Street, parked in front of a house, and bought crack cocaine from Begley. After the transaction, Bowens dropped off Begley at the corner of Hermosa and 24th Avenue North. Bowens and Detective Guyton returned to their original location, and Bowens turned over two ounces of a substance that field-tested positive as cocaine. Detective Guyton searched Bowens and his car for drugs and contraband but did not find anything. The State played the recording of the drug transaction for the jury. During the transaction, Begley weighed the drugs for Bowens, and Bowens counted out $2,200 in twenty-dollar-bills for her.

Detective Guyton testified that the fifth and final drug buy occurred on May 22, 2009. On that day, "almost the exact same thing [happened] as the previous time" except that the police planned to arrest "whoever showed up." Bowens telephoned Ree-Ree and told her that he wanted to buy four ounces of crack cocaine. Ree-Ree said she could only sell him three ounces and told him to go to 24th Avenue North. Detective Guyton put a wire on Bowens, searched him and his car, and gave him $3,300. Bowens telephoned Ree-Ree, and she told him that she was "send[ing] [Tina-Baby] out with yours" and that "[Tina-Baby] gonna bring the [scale] with her." Bowens drove to 24th Avenue North near Meharry and picked up Begley. Begley instructed him to drive around the block and park in front of Pearl-Cohn High School on 25th Avenue North. There, Begley weighed the drugs for Bowens. When Bowens began counting out the money for her, police officers arrested Begley and pretended to arrest Bowens. The officers found the buy money, a digital scale, and what appeared to be three ounces of crack cocaine in the front passenger area of Bowens's car. The State played for the jury the May 22 audio recordings of Bowens's calls to Ree-Ree and the drug buy with Begley.

Detective Guyton testified that he returned to the police department and prepared warrants for Begley's, the appellant's, and Murphy's arrests. The sheriff's department did not pay Bowens for his help on April 17. However, the department paid him $40 for his work on May 1, $100 for his work on May 15, and $400 for his work on May 22.

On cross-examination, Detective Guyton acknowledged that he never saw the appellant "hand" drugs to Bowens and never saw Begley, Murphy, or Bowens hand money to the appellant. He also acknowledged that he never saw the appellant get into Bowens's car and that it was not unusual to see the appellant in the neighborhood where the drug buys occurred. Detective Guyton obtained the call records for the telephone number Bowens dialed to speak with the appellant. He stated that "there was no subscriber information,

which is not uncommon for drug dealers" and that the records showed almost 5,000 incoming and outgoing calls for the phone number during a one and one-half-month period. Murphy pled guilty to sale of a Schedule II controlled substance and conspiracy to sell a Schedule II controlled substance for her participation in the drug buy on May 1.

On redirect examination, Detective Guyton testified that Begley also pled guilty. The State introduced into evidence judgments of conviction showing that in July 2009, Begley pled guilty to two counts of selling one-half gram or more of cocaine and one count of conspiracy to sell one-half gram or more of cocaine and that she received an effective twelve-year sentence.

Detective Andrae Starling of the MNPD testified that on April 17, 2009, he participated in the controlled buy on Lena Street, "set up" surveillance on Lena, and witnessed the drug transaction involving the appellant. On April 24, 2009, a second controlled buy occurred. Detective Guyton was not working that day, so Detective Starling took his place. Bowens and Agent Miller came to Nashville, and Bowens placed a controlled call to Ree-Ree. The State played the audio-recorded call for the jury. During the call, Bowens told Ree-Ree that "I need to get two of 'em this time." Ree-Ree told him "alright" and told him to call when he got to Nashville. Detective Starling searched Bowens and his car, gave Bowens a recording device and a listening device, and gave him $2,200. Bowens telephoned Ree-Ree again, and the State played the audio-recording of the call. During the conversation, Ree-Ree told Bowens to go "back behind the store where you came before . . . so I can walk around the corner to meet you." Detective Starling set up surveillance on Lena Street and saw Bowens pull up to the second house on the right. A black Chevrolet SUV stopped directly across the street from Bowens. Begley got out of the SUV and got into Bowens's car, and the SUV drove away. Detective Starling heard Bowens and Begley conduct the drug transaction. When it was complete, the black SUV returned. Begley got into it, and the SUV drove away. Detective Starling obtained the license tag number for the vehicle, which turned out to be registered to a Mechelle Clark or Reba Woods. Bowens gave Detective Starling a plastic bag, and the substances in the bag field-tested positive for cocaine. Detective Starling searched Bowens and his vehicle for money and contraband but did not find anything. The State played the audio-recording of Bowens's drug buy for the jury. During the buy, Begley informed Bowens that she did not bring the scale. However, Begley also told him that "she just gave it to me" and that "you know it's straight. She ain't gonna do you like that."

On cross-examination, Detective Starling testified that the SUV had dark tinted windows and that he could not see the person driving it. He did not see the appellant on April 24.

Ernest Bowens testified that he had ten 1999 convictions for forgery and a 2004 conviction for burglary. He spent time in prison for the convictions and was paroled in December 2007. In April 2009, while he was still on parole, the police arrested him for selling crack cocaine on three separate occasions. On the Friday before the appellant's trial, Bowens pled guilty to three counts of possessing cocaine with intent to sell and received a fifteen-year sentence. Bowens said he was scheduled to report for prison "today as a matter of fact."

Bowens testified that on April 15, 2009, he told Agent Tim Miller that he could buy drugs from "Reba." Bowens said he had met Reba in 1997 while he lived in Nashville, also knew her as "Ree-Ree," and knew her "[f]airly well." He had spoken with her in person and on the telephone and was familiar with her voice. The State asked Bowens how often he came into contact with Reba, and he said, "Sometimes everyday, sometimes it might be spreaded out two or three days apart or something." Bowens was in prison from 1999 to 2001 and was reincarcerated in 2004. He was released in December 2007, contacted Reba in mid-2008, and began buying drugs from her. Most of the time, Reba would send someone with the drugs to meet him. Bowens identified the appellant in court as Reba.

Bowens testified that in April 2009, he began working with the police. On April 17, 2009, he telephoned the appellant and told her that he wanted to buy "a whole one," meaning "a whole ounce." He also told her that he wanted it "hard," meaning that he wanted crack cocaine as opposed to powder cocaine. Bowens set up the controlled drug buy with the appellant. When he arrived at Ben Miller's house, the appellant and Katrina Begley were standing on the sidewalk. Begley got into his car and weighed the crack cocaine, and Bowens paid her $1,100.

Bowens testified that on April 24, 2009, he set up another controlled drug buy with the appellant and went to Ben Miller's house. Begley was waiting on the sidewalk. A black SUV passed by, and the driver lowered the driver's side window slightly. Bowens said he could tell from the driver's "hairdo" that the driver was the appellant. Begley got into Bowens's car and weighed the drugs for him, and he gave her the money for the drugs. When the black SUV returned, Begley got into the vehicle. Bowens saw through the SUV's windshield that the driver was the appellant.

Bowens testified that for the controlled drug buy on May 1, he picked up Ruby Murphy and drove to a house on Albion Street. He said that the house was "a known crack house" and that he was "pretty nervous" about going inside with the buy money. Nevertheless, he went into the house with Murphy. He counted out the money for her, and she gave him the drugs. Other people were in the house, but Bowens did not buy drugs from them. After he left the house, he spoke with the appellant over the telephone.

Bowens testified that on May 15, he again bought drugs from Begley. During the transaction, they referred to the appellant. Bowens testified that on May 22, the police planned the final transaction and were going to "make a bust." Bowens spoke with the appellant and arranged to meet Begley. When Bowens picked up Begley, she was nervous and told him to drive to another place. There, Begley told Bowens that "[s]he straight," referring to the appellant. Begley weighed the drugs for Bowens, and he started counting out the money for her. At that point, the police surrounded his car and arrested them. Later that day, Bowens returned home. He said the appellant telephoned him, told him that he was a "snitching B," and told him that she was going to get him.

The State played excerpts from all of Bowens's telephone calls to Ree-Ree, and he identified her voice as that of the appellant. Bowens said that for all of the drug buys, he set them up with the appellant; he never spoke on the phone with Begley or Murphy.

On cross-examination, Bowens testified that he was forty-nine years old and had grandchildren. He described prison as "[h]ell on Earth" but acknowledged that he continued to commit crimes when he was released on parole. On April 15, 2009, Bowens told Agent Miller about "Ree-Ree." Bowens did not know Ree-Ree's last name. He acknowledged that the appellant never handed him any drugs, that he never handed the appellant any money, that he never saw the appellant hand drugs to Begley or Murphy, and that he never saw the appellant receive money from them. He also acknowledged that the MNPD paid him a total of $600 for his work in this case. He said that the money "was for gas is what I took it for." Defense counsel asked him, "So, on May 22nd, your gas cost $400?" Bowens answered, "Yes, I left town."

On redirect examination, Bowens testified that he never asked the MNDP for payments. He also stated that he was not being paid for his testimony.

Denotoria Patterson, a forensic chemist with the Tennessee Bureau of Investigation (TBI), testified as an expert in forensic chemistry that she analyzed the substance recovered from Bowens on April 17, 2009. The substance was cocaine, a Schedule II controlled substance, and weighed 26.4 grams. Patterson also analyzed the substances recovered from Bowens on May 22, 2009. The substances were cocaine base, also a Schedule II controlled substance, and had a total weight of 81.6 grams.

Laura Adams, a forensic scientist with the TBI, testified that she analyzed the substances recovered from Bowens on April 24. The substances were cocaine base and weighed 26.8 and 26.6 grams. Adams also analyzed the substances recovered from Bowens on May 15. The substances were cocaine base and weighed 27.4 and 27.9 grams.

Ella Carpenter, a special agent forensic scientist with the TBI, testified that she analyzed the substances recovered from Bowens on May 1. The substances were cocaine base and weighed 26.4 and 27.6 grams.

Detective Matthew Grindstaff of the MNPD testified that on January 27, 2010, he served outstanding warrants on the appellant at her home. Detective Grindstaff read Miranda warnings to the appellant, and she agreed to speak with him. The State played an audio-recording of the interview for the jury. During the interview, the appellant acknowledged that she had been selling drugs "off and on." However, she said business was "down a little bit" due to the outstanding warrants in this case. Detective Grindstaff asked her how much she was selling per week, and the appellant answered, "I told you I'm not really back at it. I just maintain my little bills." He asked if she was selling ten ounces per week, and she replied, "I can't even get out and do that. But I . . . can get, get as much as I need to buy, you know, people 'cause they know I was big." On cross-examination, Detective Grindstaff acknowledged that the appellant was referring to her ability to obtain large amounts of cocaine. At the conclusion of Detective Grindstaff's testimony, the State rested its case-in-chief.

Forty-five-year-old Katrina Begley testified for the appellant that she currently was serving a twelve-year sentence for her role in this case. Begley said that in May 2009, she sold cocaine to Ernest Bowens, whom she met through "Ree-Ree and Johnny." She said that Ree-Ree and Johnny were married, that she sold cocaine for them, and that the Ree-Ree she was referring to was not the appellant. She stated, "Her name is Reba too, but I don't know her last name." She said that Ree-Ree and Johnny paid her with crack cocaine and that "I would meet them somewhere and then they would take me to a spot to drop me off where they tell [Bowens] to be at and then I would be already there, and he'll pull up and I get in the car with him." Ree-Ree and Johnny were always together when they dropped off Begley to meet Bowens.

Begley testified that the black SUV seen on April 24 belonged to her friend, Mechelle. She said that she had asked Mechelle for a ride that day and that Mechelle "wear[s] her hair nice ways." She said that she never received drugs from the appellant, gave money to the appellant, or saw the appellant at Ben Miller's house. She said that she pled guilty to selling cocaine and conspiracy to sell cocaine and that "it dropped off my school zone." When asked what she told her attorney about the appellant, Blakley said, "I told him I don't know who he talking about."

On cross-examination, Begley testified that she did not know the appellant and that "I just know her through coming through the hood." She said she met Bowens one time in April 2009 and twice in May 2009. One day in May, Ree-Ree and Johnny telephoned Begley

-9-

and had her deliver three ounces of cocaine to Bowens. Mechelle drove Begley to meet Bowens and picked up Begley when the transaction was over. After Begley was arrested on May 22, she received a letter from a friend, telling her that the appellant was in trouble. Begley wrote a letter to the appellant's attorney and informed him that she needed to testify for the appellant because "[t]hey got the wrong Reba." She acknowledged that at her guilty plea hearing, the State advised the trial court about the facts of her case. She also acknowledged that she was listening at the hearing but said that she did not remember the State's referring to the appellant as "Reba Woods" during its recitation of the facts. Begley acknowledged having prior convictions for selling drugs and criminal impersonation.

On redirect examination, Begley testified that she had been using crack cocaine since 1989 and that it affected her memory sometimes. However, she stopped using crack cocaine when she was incarcerated on May 22, 2009, and was not using crack when she pled guilty.

On recross-examination, Begley acknowledged that after her arrest on May 22, 2009, the police put her into the back of a patrol car with Bowens. She said she did not remember telling him, "You don't know no Reba." She said that although Ree-Ree and Johnny were always together, she referred only to Reba because "that's who I deal with is Ree-Ree."

Detective Guyton testified on rebuttal for the State that Bowens was wearing a digital recorder on May 22, 2009, and that it recorded Bowens's conversation with Begley in the back of the patrol car. According to the recording, Begley told Bowens that "you don't know no Reba at all, you hear me?" Begley also told him, "I don't care if they want you to snitch, you don't know no Reba."

The jury convicted the appellant as charged of three counts of selling twenty-six grams or more of cocaine with 1,000 feet of a school, a Class A felony, for the transactions that occurred on May 1, 15, and 22, 2009, and for two counts of selling twenty-six grams or more of cocaine within 1,000 feet of a park, a Class B felony, for the transactions that occurred on April 17 and 24, 2009. After a sentencing hearing, the trial court sentenced her as a Range III, career offender to sixty years for each Class A felony conviction and thirty years for each Class B felony conviction. The trial court ordered that she serve the sixty-year sentences concurrently and that she serve the thirty-year sentences concurrently but consecutively to the effective sixty-year sentence for a total effective sentence of ninety years in confinement.

## II. Analysis

### A. Motion to Sever

-10-

First, the appellant contends that the trial court erred by denying her motion to sever the offenses. The State argues that the trial court properly denied the motion. We conclude that the trial court erred and that the error was not harmless as to the appellant's convictions for the three transactions that occurred in May 2009. Therefore, those convictions must be reversed and the case remanded to the trial court for new trials on those charges.

Before trial, the appellant filed a motion to sever the offenses, arguing that severance was necessary because the offenses occurred on different dates, at different places, and were unrelated. She also argued that "the mere allegation of each offense before a jury will result in extreme prejudice and harm."

At the hearing on the motion, Detective Guyton testified that before his involvement with this case, he patrolled the "Twenty-Eighth Avenue-Clifton area" and got to know the appellant "on a fairly regular basis." In mid-April 2009, a CI working for the MNPD made several controlled telephone calls to the appellant, also known as "Ree-Ree." The first calls were made to the appellant on April 17 and resulted in her agreeing to sell the CI one ounce of crack cocaine for $1,100. The appellant told the CI to go to Ben Miller's house. Deputy Guyton said he knew "exactly where Ms. Woods was talking about" and that he had encountered her numerous times at the house on Lena Street at Clifton Avenue. The appellant told the CI that another person would meet him there. Detective Guyton followed the CI to Miller's house and saw the appellant standing with Trina Begley, also known as "Tina Baby," on the corner of the intersection. Begley got into the CI's car. The appellant spoke briefly with the CI, walked twenty feet away, and watched the transaction.

Detective Guyton testified that on April 24, the "exact same thing happened." The CI spoke with the appellant, she agreed to sell him two ounces of cocaine, and she told him to go "to the same place as before." Officers followed the CI to the house on Lena, and a black SUV pulled up to the CI's car. Begley got out of the passenger side and got into the passenger side of the CI's vehicle. The black SUV pulled off, and the officers were able to get the license tag number. Although the officers could not see into the SUV, the license tag number revealed that it was registered to the appellant. The next controlled buy occurred on May 1. The CI called the appellant, and she agreed to sell him two ounces of crack cocaine. She asked if he knew the location of Pearl-Cohn High School, and the CI said yes. Detective Guyton said he followed the CI to the school, which was "just several blocks from where the first two deals occurred." Ruby Lee Murphy was waiting there for the CI and directed him to a house on Albion Street where the drug transaction occurred. Detective Guyton said that after the CI left the house, the CI received a call from the appellant, wanting to know "if the deal went okay."

Detective Guyton testified that on May 15, the CI telephoned the appellant and asked

to buy crack cocaine. The CI told the appellant that he had not liked going into the house on Albion Street. The appellant told him that "Tina Baby . . . is back now" and that he would be dealing with Tina Baby again. The appellant agreed to sell him two ounces of crack cocaine for the usual price of $1,100 per ounce and told him to go to 24th Avenue North and Meharry, the same location where the CI had picked up Murphy on May 1. When the CI got there, Begley got into his car, told him to drive around the block, and told him to pull over. Detective Guyton said that she weighed two ounces of crack cocaine for the CI, that the CI counted the money for her, and that they "part[ed] ways." On May 22, the CI telephoned the appellant and set up a buy for three ounces of crack cocaine. The appellant instructed him to go to 24th Avenue North and Meharry. Police officers followed him there, and Detective Guyton saw Begley waiting for the CI. Begley got into the CI's car and instructed him to drive around the block. They parked within one block of Pearl-Cohn High School, Begley weighed the cocaine in the car, and the CI counted out the money and gave it to her. At that point, Sergeant Donegan gave "the takedown signal," and police officers arrested Begley and the CI. After the arrests, Detective Guyton asked Begley about the appellant, and Begley told him, "I don't know who you're talking about." Detective Guyton put Begley into the back of a patrol car with the CI, and the CI's recording device recorded Begley telling him, "'You don't know Reba.'" After the arrests, the appellant disappeared from the area.

On cross-examination, Detective Guyton testified that prior to this case, he had spoken with the appellant numerous times but had never arrested her. On April 17, other people also were on the sidewalk near Ben Miller's house. The appellant and Begley walked up to the CI's car together, but only Begley got into the vehicle. Detective Guyton acknowledged that the appellant walked away from the CI's car but said that she walked only a few feet away and "oversaw the deal." He acknowledged that the black SUV he saw on April 24 was registered to two people, not just the appellant, but said that he had seen the appellant in the SUV on numerous occasions. The SUV's windows were tinted, and he could not determine if the appellant was in it that day. He said that on May 1, the appellant used a different "runner" to meet the CI because her regular runner was at a doctor's appointment. The CI and Ruby Murphy went into a house on Albion Street, not Ben Miller's house. On May 15, the CI talked with the appellant on the telephone and complained to her about conducting the transaction in the house. During Begley's arrest on May 24, she denied any knowledge of the appellant. Detective Guyton said that the appellant was "pretty unique in how she deals" but acknowledged that it was not unusual for drug dealers to send runners, sell drugs once every week or two weeks, or conduct a drug transaction in the buyer's car. He also acknowledged that he never found any "buy money" in the appellant's possession.

On redirect examination, Detective Guyton testified that the appellant's drug dealing was unusual in that she "tries to control a lotta people, and she has a lotta people in that area working for her or she helps out, as far as giving money to people around her." He stated

that the appellant had people "doing her dirty work" and that she would pay for their attorneys "or pay for other things" if they got caught. He stated that the appellant set up her drug deals over the telephone and that she "lets other people she doesn't care about, I guess, go out and take the chance of getting caught with it actually in their hand." He said that all of the drug transactions in this case took place in the same neighborhood and within walking distance of each other.

At the conclusion of the hearing, defense counsel acknowledged that he was going to be arguing at trial that the appellant did not have anything to do with the drug transactions. Based on counsel's acknowledgment, the State claimed that the transactions were part of a common scheme or plan in that they were part of a continuing conspiracy and that evidence of each transaction was admissible in the trials of the others to establish the appellant's identity. The State also claimed that evidence of each transaction was admissible in the trials of the others because the CI and the appellant often referred to prior transactions during their telephone conversations. Regarding the prejudicial effect of the evidence in one trial, the State argued that the prejudicial effect was not outweighed by the danger of unfair prejudice because "obviously proving the identity of the defendant is probably one of the most probative things that has to happen at the trial."

The trial court found that the transactions were part of a larger continuing plan or conspiracy to sell drugs.[1] The court noted that the transactions occurred close in time and proximity to each other, that four of them involved the same people, and that they involved "discussions of telling Reba this and telling Reba that." The court found that the appellant's identity, motive, and intent were going to be issues at trial and that the appellant's actions on the five different dates were highly probative "of all of those issues that the State has to show." The trial court acknowledged that a jury's hearing about all five transactions would be prejudicial but concluded that the highly probative value of the evidence was not outweighed by its prejudicial effect. Thus, the trial court denied the appellant's motion to sever.

Tennessee Rule of Criminal Procedure 8(b) states that two or more offenses may be joined in the same indictment if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character. Tenn. R. Crim. P. 8(b)(1), (2). Tennessee Rule of Criminal Procedure 13(b) provides that the trial court may order severance of offenses prior to trial if such severance could be obtained on motion of a defendant or the State pursuant to Rule 14. Rule 14(b)(1) provides that "[i]f two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one

---

[1]Judge Steve Dozier ruled on the motion to sever but did not preside over the appellant's trial.

would be admissible in the trial of the others."

Our supreme court has held that "decisions to consolidate or sever offenses pursuant to Rules 8(b) and 14(b)(1) are to be reviewed for an abuse of discretion." State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). "A holding of abuse of discretion reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999).

In examining a trial court's ruling on a severance issue, the primary consideration is whether the evidence of one offense would be admissible in the trial of the other if the offenses remained severed. See Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000). Essentially, "any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" Id. (quoting Moore, 6 S.W.3d at 239). As such, the trial court must determine from the evidence presented that (1) the multiple offenses constitute parts of a common scheme or plan, (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant. Id. (citations omitted).

This court previously has concluded, "A common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), overruled on other grounds by Spicer, 12 S.W.3d at 447. Typically, common scheme or plan evidence tends to fall into one of the following three categories:

> (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction.

Moore, 6 S.W.3d at 240.

Our supreme court has stated that "a larger plan or conspiracy in this context contemplates crimes committed in furtherance of a plan that has a readily distinguishable goal, not simply a string of similar offenses." State v. Denton, 149 S.W.3d 1, 15 (Tenn. 2004). "In such circumstances, the proof sought is of a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial." State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995). This court recently explained, "When the State fails to demonstrate a 'working plan' whereby the subsequent offenses are

-14-

predictable or probable from the defendant's initial offenses, the subsequent offenses cannot be classified as parts of a larger, continuing plan." State v. Casey Colbert, No. W2012-00099-CCA-MR3-CD, 2013 Tenn. Crim. App. LEXIS 524, at **53-54 (Jackson, June 18, 2013). As this court noted, "'the larger, continuing plan category has typically been restricted to cases involving crime sprees, where the defendant commits several crimes quite closely in time to one another.'" Id. at *54 (quoting State v. Allen Prentice Blye, 2002 Tenn. Crim. App. LEXIS 961, at *17 (Knoxville, Nov. 1, 2002)).

Turning to the instant case, nothing indicates that the appellant's drug sales to Bowens were part of a working plan with a readily distinguishable goal. To the contrary, they were simply a string of similar offenses.

In support of its argument that the trial court correctly concluded that the offenses were part of a larger, continuing plan or conspiracy, the State cites State v. Donald Ray Blevins, which involved a fact pattern similar to this case. In Blevins, a CI set up three controlled drug buys with the defendant, each on a different date. State v. Donald Ray Blevins No. M2009-00124-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 961 at **3-5 (Knoxville, Nov. 1, 2002), perm. to appeal denied, (Tenn. 2010). The CI made calls to the defendant and arranged to buy drugs from a third party. Id. A grand jury later indicted the defendant for three counts of delivering cocaine, and he moved to sever the offenses. Id. at **1-2. The trial court apparently found that the offenses were part of a common scheme or plan on the basis that the CI spoke with the defendant by telephone before each of the drug transactions. See id. at *20. The trial court also concluded that evidence of each offense was relevant to some material issue in a trial for the other offenses and that the probative value of the evidence of the other offenses was not outweighed by their prejudicial effect. Id. at **21-22. A panel of this court affirmed the trial court, stating that the trial court conducted the proper three-prong analysis set out by Spicer and that "the trial court's determination that the telephone calls constituted a common scheme was correct." Id. at **22-23. However, the panel did not specifically address which of the three common scheme or plan categories the evidence fell into. In our view, the fact that the CI spoke with the defendant by telephone prior to each drug buy was more akin to the distinctive design category than the larger, continuing plan or conspiracy category. That said, we see nothing distinctive about a drug buyer's contacting a dealer by telephone to arrange a drug transaction. To the extent Blevins holds otherwise, we respectfully disagree.

The drug transactions in the present case also were not part of the same criminal transaction. Therefore, we must conclude that the first prong of Rule 14(b)(1), that the offenses were part of a common scheme or plan, was not met. Thus, the trial court should have granted the appellant's severance motion.

Next, we must determine the effect of the error. When reviewing a trial court's erroneous consolidation of offenses, the appellate court "must determine whether the trial court's error 'more probably than not affected the judgment.'" State v. Garrett, 331 S.W.3d 392, 405 (Tenn. 2011) (quoting State v. Toliver, 117 S.W.3d 216, 231 (Tenn. 2003)). The defendant has the burden of demonstrating that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); State v. Rodriguez, 254 S.W.3d 361, 371-72 (Tenn. 2008). As our supreme court explained in another case involving a trial court's erroneous failure to grant a severance motion,

> In this regard, "'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which [the] proof exceeds the standard required to convict . . . .'" Spicer, 12 S.W.3d at 447 (quoting Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979)). "'The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome of the trial on its merits.'" Toliver, 117 S.W.3d at 231 (quoting State v. Gilliland, 22 S.W.3d 266, 274 (Tenn. 2000)). Nevertheless, we must remain focused not simply on the weight of the evidence, but on "the actual basis for the jury's verdict." Rodriguez, 254 S.W.3d at 372.

In this case, Ernest Bowens testified that he had known the appellant since 1997 and that he knew her as Reba or "Ree-Ree." He also testified that he knew her fairly well, that he recognized her voice, and that he set up the five transactions with her over the telephone. Detective Guyton testified that he came into contact with the appellant often from 2001 to 2007, that he had spoken with her on numerous occasions, and that he recognized her voice. The State played audio-recordings of Bowens's calls to Ree-Ree, and Bowens and Detective Guyton identified her voice as that of the appellant. They also identified the appellant in court as Ree-Ree. Moreover, for the first transaction, the appellant accompanied Begley to Bowens's car, and for the second transaction, Bowens saw the appellant driving the SUV that dropped off and picked up Begley. Therefore, we are convinced that the trial court's error was harmless as to the offenses that occurred on April 17, count 1, and April 24, count 2.

As to the remaining three offenses, proof that Bowens telephoned the appellant and set up the transactions on May 1, 15, and 22 and was sufficient to support those convictions. However, evidence of the appellant's presence with Begley at the April 17 and April 24 transactions exceeded that which was necessary to convict the appellant of the May offenses and was highly prejudicial. Therefore, we cannot say that the trial court's error was harmless as to the drug buys that occurred on May 1, May 15, and May 22, counts 3 through 5, and

-16-

conclude that those convictions must be reversed and the case remanded to the trial court in order for the appellant to be retried separately for those offenses. Nevertheless, in the event of further appellate review, we will address the appellant's remaining issues as to all five convictions.

## B. Sufficiency of the Evidence

Next, the appellant contends that the evidence is insufficient to support the convictions because the proof failed to establish that the drug-free zones existed at the time of the offenses. The State claims that the evidence is sufficient. We conclude that the evidence is sufficient to show that the appellant sold twenty-six grams or more of cocaine and that she did so within 1,000 feet of a school as alleged in counts 3, 4, and 5 but not within 1,000 feet of a park as alleged in counts 1 and 2.

"When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011); see also Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012); see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. See Wagner, 382 S.W.3d at 297; State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The jury, as the finder of fact, is responsible for assessing the credibility of the witnesses, deciding the weight to accord their testimony, and reconciling any conflicts in the proof. See Wagner, 382 S.W.3d at 297; State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). On appeal, this court cannot re-weigh the evidence or draw any inferences from it other than those drawn by the jury. See Wagner, 382 S.W.3d at 297; Cabbage, 571 S.W.2d at 835. A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of both. "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Tennessee Code Annotated section 39-17-417(a)(3) provides that it is an offense knowingly to sell a controlled substance. A violation of subsection (a) with respect to twenty-six grams or more of cocaine is a Class B felony. Tenn. Code Ann. § 39-17-417(i)(5). Moreover, the Drug-Free School Zone Act provides that a sale of cocaine "that occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a . . . school . . . or park shall be punished one (1)

-17-

classification higher than is provided in § 39-17-417(b)-(i) for such violation." Tenn. Code Ann. § 39-17-432(b)(1). However, "[a] person convicted of violating this subsection (b), who is within the prohibited zone of a . . . park shall not be subject to additional incarceration as a result of this subsection (b) but shall be subject to the additional fines imposed by this section." Id. § 39-17-432(b)(3). Therefore, a defendant convicted of selling twenty-six grams or more of cocaine, ordinarily a Class B felony, would be punished for a Class A felony if the defendant sold the drug within 1,000 feet of a high school but would be specifically exempt from incarceration at the higher classification if the defendant sold the drug within 1,000 feet of a park.

Turning to the present case, the appellant acknowledges that the State proved that the drug-free zones existed nearly two years after the transactions but argues that the State failed to prove the drug-free zones existed at the time of the transactions in 2009. However, the appellant specifically referred to Pearl-Cohn High School and the ballfield in some of her recorded conversations with Bowens. Therefore, the evidence is sufficient to show that the appellant sold twenty-six grams or more of cocaine within 1,000 feet of a school as alleged in counts 3, 4, and 5.

As to McKissack Park, the appellant did not refer to the park during any of her conversations with Bowens. Although David Kline of the Metropolitan Nashville Planning Commission prepared a map showing that the April 17 and April 24 transactions occurred within 1,000 feet of the park, he did not make the map until February 15, 2011, almost two years after the crimes.

The State argues that the evidence is sufficient because "[a]ny rational trier of fact could have inferred that the data of the park's existence was entered into the system prior to the date Mr. Kline created the map in 2011" and that "the jury was allowed to use common sense that McKissack Park existed in 2009." In support of its argument, the State relies on State v. Calvin Eugene Bryant, Jr., No. M2009-01718-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 897, at *37 (Tenn. Crim. App. Nov. 1, 2010), perm. to appeal denied, (Tenn. 2011), in which this court stated, "The jury was allowed to use common sense in evaluating the information and . . . testimony and determining whether the buildings identified as an elementary school and a special education school were in fact schools." However, a jury's ability to use common sense to determine whether buildings identified by a testifying witness as school buildings are in fact schools is quite distinguishable from a situation in which a defendant is questioning whether a city park existed at the time of the crime. Assuming the park existed in April and May 2009, the State easily could have proven that fact. See, e.g., State v. James Alfred Reed, Jr., No. E2010-01138-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 547, at * (Knoxville, July 18, 2011) (holding that police officer's testimony alone may be sufficient to prove violation of the Act). Therefore, we conclude that although the

evidence is sufficient to show that the appellant sold twenty-six grams or more of cocaine in counts 1 and 2, it is insufficient to show that she did so within 1,000 feet of a park.

## C. Appellant's Prior Convictions

The appellant contends that the trial court erred by failing to rule on the admissibility of her prior convictions before she made her decision not to testify, resulting in an invalid waiver of her right to testify. The State argues that the appellant has waived this issue because she failed to ask the trial court for a definitive ruling and that, in any event, any error was harmless. We agree with the State.

Before trial, the State filed a notice of intent to use six of the appellant's prior convictions for impeachment. The appellant filed a motion in limine to prohibit the State from impeaching her with the prior convictions. According to her motion, four of the convictions were more than ten years old and two of them were inadmissible propensity evidence.

Before the first witness testified on the first day of trial, defense counsel stated in a jury-out hearing that "if Ms. Woods decides to testify, . . . I would just ask that if those are used for impeachment purposes that [the State] be limited to question whether she's been convicted of a felony so we don't have to start getting into propensity evidence." The trial court answered, "The case law is clear, [the State] can't just ask 'have you been convicted of a felony,' you have to ask about the specific felony, so we'll just, in the event that she testifies, we'll address that in a jury-out hearing." Two days later, the State rested its case-in-chief, and the trial court denied the appellant's motion for judgment of acquittal. The trial court asked defense counsel, "Have you discussed with your client whether or not she's going to testify?" Defense counsel announced that the appellant was not going to testify, and the trial court conducted a <u>Momon</u> hearing. During the hearing, the court advised the appellant of her right to testify, and the appellant stated that she was going to waive that right.

Pursuant to Rule 609(a), Tennessee Rules of Evidence, the State may use a witness's prior convictions to attack credibility if certain procedures and conditions are satisfied. Generally, the witness must be asked about the conviction on cross-examination, and the crime must be punishable by death or imprisonment of more than one year. Tenn. R. Evid. 609(a)(1), (2). If not so punishable, then the crime must be one of dishonesty or false statement. Tenn. R. Evid. 609(a)(2). In addition, if the witness is the accused,

> the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request

-19-

must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

In this case, the trial court informed defense counsel that it would rule on the issue "in the event that she testifies." However, Rule 609, Tennessee Rule of Evidence, plainly states that once a defendant requests a determination on probative value, the trial court must determine before the defendant testifies whether prior convictions are admissible for impeachment purposes. Nevertheless, we are not convinced that the trial court erred because the appellant failed to remind the court about the issue and ask for a definitive ruling prior to making her decision about whether to testify. See Tenn. R. App. P. 36(a). In any event, the appellant did not make an offer of proof as to her proposed trial testimony and does not assert any specific prejudice on appeal. See State v. Galmore, 944 S.W.2d 120, 123 (Tenn. 1999). Therefore, she has not demonstrated that she was prejudiced by the court's alleged error. See id. at 125 (showing that the improper impeachment of a defendant with prior convictions is subject to harmless error analysis).

### D. Appellant's Statement to Detective Grindstaff

The appellant contends that the trial court erred by allowing the State to introduce into evidence portions of her interview with Detective Grindstaff eight months after the crimes. She contends that the interview, in which she spoke about continuing to sell drugs, was inadmissible under Rule 404(b), Tennessee Rules of Evidence, and highly prejudicial. The State contends that the trial court properly admitted the statement into evidence to establish the appellant's identity as the perpetrator of the crimes for which she was on trial. We agree with the State.

Before trial, the appellant filed a motion in limine, requesting that the trial court prohibit the state from questioning any witness about the appellant's prior bad acts or any "character traits . . . that would show a propensity for drug dealing activity" pursuant to Rule 404(b), Tennessee Rule of Evidence. In a jury-out hearing on the morning of the first day of trial, defense counsel argued that the appellant's audio-recorded interview with Detective Grindstaff on January 27, 2010, was inadmissible because it "really has no probative value outside of suggesting that she has a character for selling drugs and she is a drug dealer and therefore she must have committed these crimes she's presently charged with." The State

contended that the appellant's statements during the interview were relevant. The trial court informed the parties that it would listen to the interview.

Before the State called Detective Grindstaff to the stand to testify, it reminded the court that "we do have the outstanding issue of Detective Grindstaff." The State argued, "Case law does allow for subsequent acts when relevant to identity and intent in these types of cases." The trial court, referring to the transcript of the recorded interview, ordered that the State redact the portion of the interview in which the appellant told the detective that she had been selling drugs for "a long time" and "since I guess I was about twenty-something." However, the trial court stated,

> [T]he rest of it she admits to drug sales, but it's kind of intermittently and doesn't establish her as a professional criminal, which is what those 5 or 6 lines do.
>
>       . . . .
>
> I will allow it, and I've read it several times and understand the defense'[s] argument, but I'm going to allow that portion of it. My biggest concern was the language of the portion I said to redact. The other ones, if you look at that in the full context, I mean, she says she was basically selling enough to pay her light bill. What, she lived in the Frist Mansion, that's probably not a whole lot of drug-selling on a weekly basis or whatever the case may be, so I'll allow that.

During Detective Grindstaff's testimony, the State played the following excerpt from the interview for the jury:

> Question:  You said you been selling drugs off and on [correct?]
>
> Answer:  Yeah.
>
> Question:  Off and on?
>
> Answer:  [Yep]. 'Cause I ain't been able to leave taking, you know, moving about.
>
>       . . . .

Question: Is it just 'cause you been staying in 'cause you have the warrants?

Answer: Yep slowed down a little 'cause, you know.

Question: How much are, how much are you selling a week right now?

Answer: I told you I'm not really back at it. I just maintain my little bills.

Question: How much, how much would you say like-

Answer: Just to pay the light bill and then, you know, the water.

Question: Ten ounces a week?

Answer: Ooh, [sh**] stop playing.

Question: I'm, I'm just, I'm asking.

Answer: I can't even get out and do that. But I know what I, but I can, I can get, get as much as I need to buy, you know, people 'cause they know I was big.

Tennessee Rule of Evidence 404 provides,

(b) Other Crimes, Wrongs, or Acts.- Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a

-22-

material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985).

A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Generally, "only in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character.

In the instant case, the State claimed at trial and claims on appeal that the appellant's statements to Detective Grindstaff were admissible in order to establish her identity as the perpetrator of the charged crimes. We agree. Katrina Begley's testimony for the appellant and defense counsel's closing argument placed the appellant's identity as the perpetrator squarely at issue. While the similarity between the charged crimes and the appellant's subsequent bad acts makes her statements to Detective Grindstaff highly prejudicial, their similarity also makes them highly probative. Therefore, we cannot say that the probative value of the evidence was outweighed by the danger of unfair prejudice and that the trial court abused its discretion by admitting the appellant's statements to Detective Grindstaff into evidence.

E.  Bowens's Testimony About Appellant's Prior Bad Acts

In another issue regarding Tennessee Rule of Evidence 404(b), the appellant contends

-23-

that the trial court erred by allowing Ernest Bowens to testify that he had known her since 1997 and bought drugs from her in 2008. The State argues that the trial court did not err because Bowens's testimony provided a "contextual background . . . on how he recognized the appellant's voice on the phone, and why he decided to buy drugs from the defendant after he agreed to become a confidential informant." We conclude that the trial court erred but that the error was harmless.

As part of the appellant's Rule 404(b) jury-out hearing described in the section above, Bowens testified that he met the appellant in 1997, was "getting high at the time," and began buying crack cocaine from her. Bowens said he went to prison but "hooked back up" with the appellant in 2008 or 2009. He said he continued to buy crack cocaine from her until early 2009, when he "found another source." Although Bowens testified on direct examination that he bought a quarter of an ounce of cocaine from the appellant about every other day, he testified on cross-examination that he bought cocaine from her only ten times in 2008.

At the conclusion of Bowens's testimony, the trial court ruled that he could testify about his involvement with the appellant after his release from prison in 2008. The trial court explained,

> I don't want him going back to before he went to the penitentiary in 2003 or 4 or whatever it is, that's just too long of a track record of her being a long-term drug-dealer. Yes, it's going to be a little bit prejudicial effect, the fact her being a drug-dealer before this investigation begins, but that has to come in in order for the jury to understand how they got together and started doing this and how he became a CI and went directly back to her, there's got to be some background information to explain their involvement with one another and put everything into context.

In State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000), our supreme court explained that

> contextual background evidence, which contains proof of other crimes, wrongs, or acts, may be offered as an 'other purpose' under Rule 404(b) when exclusion of that evidence would create a chronological or conceptual void in the presentation of the case and that void would likely result in significant jury confusion concerning the material issues or evidence in the case.

> [W]hen the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

Turning to the instant case, we disagree with the trial court's conclusion that Bowens's testimony was necessary to provide contextual background for the jury. The testimony at trial reflected that Bowens met the appellant in 1997, that he spoke with her in person and on the telephone, and that he knew her "fairly well." Further testimony that he bought drugs from her in 2008 and 2009, prior to his working with the police in this case, did not assist the jury in its understanding of the events or how he was able to recognize her voice, and an absence of the testimony would not have created a chronological void that would have confused the jury. Furthermore, given that the appellant's prior bad acts were the same crimes for which she was on trial, we disagree with the trial court's characterization of Bowens's testimony as "a little bit prejudicial." In any event, the evidence against the appellant was overwhelming in counts 1 and 2 and strong in counts 3 through 5. Therefore, in light of the evidence against the appellant, we conclude that the admission of the propensity evidence was harmless.

### F. Detective Guyton's Prior Encounters with Appellant

The appellant contends that the trial court erred by allowing Detective Guyton to testify that he had encountered her on almost a daily basis while he worked as a patrol officer from 2001 to 2007 because the evidence was inadmissible propensity evidence. The State argues that the trial court did not err because the officer did not testify about any prior bad acts by the appellant and that his testimony was relevant to establish how he became familiar with her voice. We agree with the State.

As part of the appellant's Rule 404(b) jury-out hearing described in the previous two sections, Detective Guyton testified that prior to his becoming a detective with the Crime Suppression Unit, he patrolled the west Nashville area, "particularly the 28th Avenue and Clifton and Lena area." He also stated,

> During my duties as a patrol officer out west, I would frequently

-25-

or daily get out of my vehicle and patrol that area . . . because there was a lot of drug activity in that area, so I would go through alleys, I would walk the streets, talk to the people when you get out of your car, you can find a lot more than you can just driving in your car, so I would get out, speak to people, make arrests, different things like that. During those encounters with people, I became familiar with Ms. Woods. Ms. Woods would hang out at Ben Miller's house, which is on Lena right at Clifton, and I would speak to her - well, I would speak to her on at least a weekly basis, if not - if not more.

He stated that he became familiar with her voice and that "when she gets excited or agitated, I would say, she begins to stutter, she speaks loudly, almost yells at you, which was, to me, almost on a daily or weekly basis, she did not like police and she didn't like me being around that area."

The trial court ruled that Detective Guyton could testify "in the generic form" about his prior involvement with the appellant. Specifically, the trial court stated that the officer could testify

that he was in west patrol, it was a high crime area, it was not uncommon to do foot patrol, again, high crime areas and this type of thing, . . . and it was not uncommon for her to be out there and he would routinely talk to her and she would [be] kind of ticked off and would leave, but that he had heard her voice over his year of patrol and he can identify that the first time I immediately heard that voice, Boom . . . . His testimony didn't get into anything about drug activities involving her directly.

Although the appellant claims that Detective Guyton's testimony amounted to inadmissible propensity evidence, we agree with the trial court that his testimony was not prohibited by Rule 404(b), Tennessee Rules of Evidence. The officer testified that he often saw the appellant in the high crime area, that she was loud, and that she disliked police officers. However, none of those are "other crimes, wrongs, or acts" prohibited by the Rule. Moreover, Detective Guyton's testimony about his frequent interactions with the appellant was highly relevant to how he was able to identify her voice. See Tenn. R. Evid. 401 (stating that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Finally, the evidence was not particularly prejudicial. See Tenn. R. Evid. 403 (providing that even relevant evidence "may be excluded

-26-

if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence"). Therefore, we conclude that the trial court did not abuse its discretion by allowing Detective Guyton to testify about his prior encounters with the appellant.

## G. Transcripts and Preambles

Next, the appellant contends that the trial court erred by allowing the State to introduce into evidence transcripts of the audio-recordings played for the jury. In a related argument, he contends that the trial court erred by allowing prejudicial preambles to remain on the recordings and transcripts. The State argues that the trial court did not err. We conclude that the trial court erred by allowing the preambles to remain on the recordings and transcripts but that the error was harmless.

During Detective Grindstaff's testimony, he identified a compact disc containing Bowens's first audio-recorded call to the appellant on April 17, 2009. The State introduced the recording into evidence as exhibit 2. Detective Grindstaff then identified a transcript of the recording and acknowledged that the transcript was an accurate reflection of it. The State advised the trial court that it had prepared copies of the transcript for the jury. During a bench conference, the trial court asked defense counsel if he was contesting the accuracy of the transcript, and defense counsel answered, "No, not at this point." The trial court informed the State and defense counsel that "[t]he evidence is the CD rather than the transcript that's being provided to assist [the jurors]. I'm also going to give the instruction that the preamble on each of these phone calls is not evidence, it's just to document the police activities, properly document police activity, but will not consider it as evidence." The trial court also informed the parties that, because defense counsel was not contesting the accuracy of the transcripts, it would allow the State to introduce the transcripts into evidence. At that point, defense counsel stated, "I guess at this point I would contest the accuracy . . . . . I don't have an objection to them looking at the transcripts while listening to the CD, but I'd rather it not be placed into evidence during the deliberations." The trial court overruled the objection and instructed the jury as follows:

> Members of the jury, you're about ready to hear the CD apparently of the first controlled call on April 17[.]
>
> . . . .
>
> You're going to be provided a copy of the transcript of that telephone call to assist you in better understanding the CD,

-27-

sometimes [it's not] easily understood just the CD itself, I'm instructing you right now that as you look at the transcript, there is basically a preamble that Agent Miller places that starts out the transcript, the statement of Agent Miller as the preamble to this transcript is not evidence and you will not consider it as evidence. Obviously the police have to properly document all their investigative activities and that's what the intent of Agent Miller's preamble is, but that itself is not evidence. The evidence is the phone conversation.

The State introduced the transcript into evidence as exhibit 3 and played the recording, exhibit 2, for the jury. The recording and transcript began with the following introductory comments made by Deputy Miller:

> Good evening my name is Tim Miller. I'm currently the assistant director of Seventeenth Judicial Drug Task Force. Today's date is April seventeenth, two-thousand and nine. Time on hands is approximately two-oh-eight, in the p.m. I'm currently located here in Shelbyville, Bedford County, Tennessee. With me right now is a confidential informant gonna place a recorded telephone call to, uh, Reba Woods, a female, lives in Nashville, Tennessee. Uh, the CI is gonna be calling, uh, Reba at [this telephone number] and attempt to set up a transaction to happen, uh, later today. At this time I'm turn[ing] this recording device off until CI talks with Reba. She also goes by the street name of Re-Re.[2]

After the State played the entire recording, Detective Guyton's testimony resumed, and the State introduced into evidence as exhibits 4 and 5 the recording and its transcript for the second call Bowens placed to the appellant on April 17. The recording and transcript included the following introductory comments by Detective Guyton:

> This is Detective Guyton. Today's date is April seventeenth, two thousand and nine, time now is approximately fifteen, thirty-seven hours. Here with the confidential informant. This informant is gonna be calling, uh, Reba Woods at [this telephone number], uh, to talk about uh, purchasing an ounce of cocaine.

---

[2]We have included the comments as they appeared in the transcript.

After the jury heard the exhibit 4 recording, the State moved to introduce into evidence the recording and its transcript of Bowen's April 17 drug buy from Katrina Begley. Defense counsel objected, stating, "I'm gonna object to the preamble on this. On this transcript he states, 'Reba Woods is going to be sending a runner to him to bring the cocaine,' just the runner statement essentially." The trial court stated, "Overruled, I've already given the instruction. On cross-examination you can let them know that's a police term they use, but since it's not evidence, I'm not going to try and get that redacted at this point." The State introduced the recording and transcript into evidence as exhibits 6 and 6A and played the recording for the jury. The recording and transcript contained the following introductory comments by Detective Guyton:

> This is Detective Guyton. Today's date is seventeenth of April, two thousand and nine, time now is approximately fifteen, forty-nine hours. Here with the confidential informant. This informant is going to be going, uh, to Twenty-Sixth Avenue North, uh, near Clifton to purchase one ounce of cocaine from Reba Woods, and Reba Woods is going to be sending a, uh, a runner to him to bring the, bring the cocaine. Uh, CI and the CI's vehicle has been searched for money and or contraband. None has been found. Uh, the CI's been given, uh one thousand, one hundred dollars of previously photocopied money.

All of the subsequent recordings and transcripts that the State introduced into evidence contained similar introductory comments made by Detective Guyton or Detective Andrae Starling.

Regarding the admissibility of the transcripts, Rule of Evidence 1002, also known as the best evidence rule, generally provides that in order to prove "the content of a writing, recording, or photograph, the original writing, recording or photograph is required." The rule's purpose is so "only the best or most accurate proof of written or similar evidence should be admitted, to the exclusion of inferior sources of the same proof, absent some extraordinary justification for the introduction of secondary evidence." Neil P. Cohen et al., Tennessee Law of Evidence § 10.01[2][a] (6th ed. 2011). However,

> [t]ape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversation and was in a position to identify the declarant with certainty, and provided the testimony of the witness in whole or in part, comports with the other rules of evidence.

State v. Walker, 910 S.W.2d 381, 394-95 (Tenn. 1995). Moreover, "a transcript of a tape may be given to a jury where the jury is instructed that the tape, and not the transcript is the actual evidence." State v. Barnard, 899 S.W.2d 617, 623-24 (Tenn. Crim. App. 1994).

In this case, the trial court recognized that the recordings, not the transcripts, were the evidence and informed the parties that it was going to instruct the jury as such. However, the trial court failed to give that specific instruction to the jury. In any event, the appellant does not claim that any material differences existed between the recordings and the transcripts. See State v. Jimmy Dale Pickett, No. M2005-02434-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 131, at **29-33 (Nashville, Feb. 14, 2007). Therefore, the trial court's error in admitting the transcripts into evidence without giving the instruction was harmless. See Tenn. R. App. P. 36(b).

As to the preambles, we are puzzled as to why the State would allow law enforcement commentary regarding the investigation of a defendant on trial to remain on audio-recordings that the State plays for a jury. See, e.g., State v. Alfonzo Marquis Sutton, No. M2011-01575-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 92, at **12-21 (Nashville, Feb. 3, 2013). The State should always redact such introductory comments, and the trial court erred by failing to exclude the preambles from the recordings and transcripts. In any event, all three of the officers gave testimony that was essentially the same as their commentaries. See Tenn. R. App. P. 36(b). Moreover, the trial court instructed the jury that the preambles were not evidence and that the jury was not to consider them as such. "It is presumed that the jury followed the trial judge's instruction[] not to consider inadmissible evidence." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). Therefore, we conclude that the trial court's error was harmless. See Tenn. R. App. P. 36(a).

### H. Murphy's and Begley's Convictions

The appellant contends that the trial court erred by allowing Detective Guyton to testify about Ruby Murphy's guilty pleas that resulted from her role in this case. In a related argument, he contends that the trial court erred by allowing the State to introduce into evidence certified copies of Katrina Begley's convictions that resulted from her role. The State claims that the appellant opened the door to the evidence and that, in any event, the trial court instructed the jury that it could not consider the evidence against the appellant. We conclude that the appellant is not entitled to relief.

On direct examination, Detective Guyton testified that after Begley's arrest on May 22, he "typed up the warrants" for the arrests of Begley, Murphy, and the appellant. On cross-examination, defense counsel questioned the detective as follows:

Q. Okay. And Ms. Murphy was arrested and charged with these transactions?

A. Yes, sir.

Q. And she did - has been convicted to your knowledge?

A. Yes, she's [pled] guilty.

Q. For the - to the sale of the schedule two substance?

A. Sale and conspiracy, I believe.

Defense counsel asked Detective Guyton about the April 17 transaction and why the police did not arrest Begley at that time. Detective Guyton said he chose not to arrest Begley after the first drug transaction because "my job is to bring the case, to get a pretty solid case and bring it to the court so that doesn't happen again." The following exchange then occurred:

Q. And you have essentially substantially the same evidence against Ms. Begley and Ms. Murphy?

A. Yes, same charge.

Q. Okay. Phone calls, controlled buy, one to three ounces of cocaine?

A. Phone call is from Ms. Woods not Ms. Begley and Ms. Murphy.

Q. Audio of the buys, correct?

A. Yes.

Q. And then an actual transaction?

A. Correct.

Q. So, as in the first transaction, you actually made the decision to allow her to remain on the street although you had the evidence to arrest her?

-31-

A. Absolutely, yes.

At that point, cross-examination concluded. The State requested a bench conference and advised the court, "By bringing up the disposition of Ms. Murphy's case, I would submit that it is now relevant to what Ms. Begley pled guilty to in this case, which included conspiring with Reba Woods to sell drugs." Defense counsel responded, "I thought she only pled guilty to the sales. She was charged with conspiracy. . . . I guess that I would object to the fact that because I brought up Ms. Murphy's disposition - [.]" The trial court interrupted defense counsel and asked, "Why did you bring up Ms. Murphy's disposition?" The record does not reflect that defense counsel answered or attempted to answer the trial court. The court ruled, "I'm going to allow [the State] to inquire as to the disposition [of] what she pled to, but not the allegations of who the conspiracy involved." The State advised the court that it was going to introduce the judgments of conviction into evidence, and defense counsel stated, "That's fine."

On redirect examination, the State asked Detective Guyton if Begley's case had been resolved, and he stated, "I know she pled guilt to the charges." Without any objection from the appellant, the State introduced certified copies of Begley's judgments of conviction into evidence. After Detective Guyton's testimony concluded, the trial court instructed the jury that "the fact that these other individuals pled guilty cannot be considered as evidence against Ms. Woods. You have to rely on the evidence presented as it relates to Ms. Woods and the law that applies to her case."

On appeal, the appellant contends that the trial court erred by allowing Detective Guyton to testify about Murphy's guilty pleas and that the detective's testimony violated her right to a fair trial and the right to confront the witnesses against her. However, it was defense counsel, not the State, who elicited the officer's testimony about Murphy's pleas. Therefore, we find no merit to this issue.

The appellant also contends that the trial court erred by allowing the State to introduce into evidence certified copies of Begley's convictions. However, as we have noted, when the State announced that it was going to seek to introduce the judgments into evidence, defense counsel said, "That's fine." Therefore, the appellant is not entitled to relief. See Tenn. R. App. P. 36(a).

I. Begley's Post-Arrest Conversation with Bowens

The appellant contends that the trial court erred by allowing the State to reopen its cross-examination of Begley after the appellant had rested her case-in-chief and question Begley about Begley's conversation with Ernest Bowens while they were in the back of the

-32-

patrol car. The appellant also contends that the trial court erred by allowing the State to read portions of the conversation to the jury during its rebuttal case and introduce the conversation into evidence as substantive evidence. The State contends that the trial court properly allowed the cross-examination and correctly allowed the introduction of the conversation. We agree with the State.

In a jury-out hearing during the trial, the trial court ruled that Begley's post-arrest statements were inadmissible hearsay. Subsequently, during the appellant's case-in-chief, Begley testified on direct examination that another Ree-Ree, not the appellant, and Johnny gave her the cocaine to sell to Bowens. On cross-examination, the State questioned Begley about her guilty plea hearing and if she remembered hearing the State mention "Reba Woods" during its recitation of the facts. Begley said she did not remember. On redirect examination, defense counsel questioned Begley about her drug use and whether it had affected her memory. At the conclusion of defense counsel's redirect examination, the State advised the court that it did not have any additional questions, and the appellant rested her case. The trial court asked if the State had any rebuttal proof, and the State said, "Yes, . . . I think that now the [recorded] conversations in the back of the patrol car have been made relevant and should be played for the jury, . . . and that type of information, that that is now relevant towards bias since they've put Ms. Begley on." Defense counsel objected, stating that the conversation was hearsay and that Begley's testimony had not been inconsistent with the recording. The trial court reviewed a transcript of the recording and stated, "In looking at it, I tend to agree with [defense counsel], I don't know that it's a prior inconsistent statement." The State advised the court that "it's not for prior [in]consistencies necessarily. Information in here where she's trying to cover up the identity that she is selling for is absolutely relevant to her testifying today of whether she's still trying to cover up the identity of this person." The trial court stated that "I think the proper way to get that introduced would be to cross examine her on it" and ruled that the state could reopen its cross-examination. Defense counsel stated that "we strongly object. The defense has rested, we have no intentions of asking her anymore questions." The trial court overruled the objection.

Begley returned to the stand, and the State's cross-examination resumed. The State asked Begley if she remembered telling Bowens in the patrol car, "[D]on't you know no Reba at all, you hear me? . . . . You don't know no Reba . . . . You don't be snitching do you?" The State showed Begley a transcript of the recording, and Begley said, "I don't remember that." The State also questioned Begley about other portions of her conversation with Bowens and showed her the portions in the transcript. Subsequently, in a jury-out hearing, the State requested to introduce into evidence those portions of the transcript that were inconsistent with Begley's testimony, including the portion in which she told Bowens, "You don't know no Reba." The trial court ruled that the State could introduce those portions of the transcript during its rebuttal case.

On rebuttal, the State called Detective Guyton to the stand. From the transcript, he and the State read to the jury numerous parts of Begley's conversation with Bowens. At the conclusion of his testimony, the State introduced the portions of the recording and corresponding portions of the transcript into evidence.

First, the appellant contends that the trial court erred by allowing the State to reopen its cross-examination of Begley after the appellant had rested her case-in-chief. However, "'[i]n the absence of an injustice, a trial court's decision to permit the introduction of further evidence after a party has rested must be upheld.'" State v. Chris L. Young, No. M2008-01255-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 748, at *8 (Nashville, Sept. 9, 2009) (quoting State v. Anthony Paul Alderson, No. 01C01-9611-CC-00461, 1997 Tenn. Crim. App. LEXIS 1174, at *7 (Nashville, Nov. 21, 1997)); see Clariday v. State, 552 S.W.2d 759, 770-71 (Tenn. Crim. App. 1976). "'In exercising its discretion, the court must consider the timeliness of the motion, the character of the testimony, and the effect of granting of the motion.'" Id. (quoting United States v. Thetford, 676 F.2d 170, 182 (5th Cir. 1982)). Considering these factors, we conclude that the trial court did not abuse its discretion by allowing the State to reopen its cross-examination of Begley.

The appellant also claims that the trial court erred by allowing the State to cross-examine Begley about her conversation with Bowens in the back of the patrol car. Again, we disagree with the appellant. The propriety, scope, manner, and control of the cross-examination of witnesses rests within the discretion of the trial court. State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). "A witness may be cross-examined on any matter relevant to any issue in the case," including credibility. Tenn. R. Evid. 611(b); see also Neil P. Cohen et al. Tennessee Law of Evidence § 6.11[5][a] (6th ed. 2011). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Begley testified on direct examination that she delivered the drugs to Bowens for a different Reba, and her testimony conflicted with that of the State's witnesses. Therefore, her credibility was at issue, and the defense opened the door to cross-examination about inconsistencies between her testimony and her statements to Bowens in the patrol car. See State v. Gomez, 367 S.W.3d 237, 246 (Tenn. 2012) (stating that "'opening the door' is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence).

We now direct our attention to the appellant's claim that the trial court erred by allowing the State to introduce portions of Begley's conversation with Bowens into evidence pursuant to Rule 803(26), Tennessee Rules of Evidence, and that trial court "compounded" the error by allowing the State to "[act] out" the conversation for the jury. "[I]t is well-established that trial courts have broad discretion in determining the admissibility of

evidence, and their rulings will not be reversed absent an abuse of discretion." State v. Stinnett, 958 S.W.2d 329, 331 (Tenn. 1997). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is not admissible during a trial unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802.

Tennessee Rules of Evidence 803(26) provides a hearsay exception for a testifying witness's prior inconsistent statement. The statement is admissible substantively if the following conditions are satisfied:

> 1. The statement must be admissible under Tennessee Rule of Evidence 613(b).
>
> 2. The declarant must testify at the trial or hearing and be subject to cross-examination about the statement.
>
> 3. The statement must be audio or video recorded, written and signed by the witness, or given under oath.
>
> 4. The trial court must conduct a jury-out hearing to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26) & Advisory Comm'n Cmts. Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."

Although the Tennessee Rules of Evidence do not define "inconsistent," this court has stated,

> When a witness has been asked whether he made a contradictory statement and neither admits nor denies but claims that he doesn't remember, the statement is admissible because such statement when proven may have been such as to amount to a direct contradiction of the witness and may also convince the jury that the witness did not speak the truth in saying that he did

not remember making the statement.

State v. Ricky Thompson, No. 03C01-9406-CR-00198, 1996 Tenn. Crim. App. LEXIS 31, at **30-31 (Knoxville, Jan. 24, 1996).

Turning to the present case, when the State reopened its cross-examination of Begley, it questioned Begley extensively about her audio-recorded statements to Bowens in the back of the patrol car. Begley often claimed that she did not remember making the statements, including when the State asked her if she told Bowens that "you don't know no Reba." Thus, those statements were inconsistent, and she was afforded the opportunity to explain or deny them as required by Rule 613(b). Moreover, the trial court held an extensive jury-out hearing on the issue, going over each statement that the State wanted admitted into evidence. Although the court did not specifically state whether the prior statements were made under circumstances indicating trustworthiness, we have listened to the patrol car recording, and Begley's statements, made immediately after her arrest, would qualify as excited utterances under the exceptions to the hearsay rule. See State v. Loy Ren Rogers, No. E2011-02529-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 814, at *78 & n.12 (Knoxville, Sept. 23, 2013) (noting that although the trial court did not make a specific determination regarding the trustworthiness or the prior statements, the statements qualified as excited utterances pursuant to Tennessee Rule of Evidence 803(2), "a firmly rooted hearsay exception and bearing particularized guarantees of trustworthiness"). Therefore, we conclude that the trial court did not err by admitting the statements as substantive evidence.

## J. Improper Closing Argument

The appellant claims that the prosecutor violated her right to a fair trial by making "highly inflammatory, improper closing argument." The State contends that the prosecutor's argument was not improper. We agree with the State.

During the appellant's closing argument, defense counsel stated as follows:

> There were two people who identified her voice here today,
> Detective Guyton and [Bowens]. Let's start with Detective
> Guyton . . . . He's familiar with Reba Woods. . . . She was a
> nuisance. She was loud. She was obnoxious. She was a thorn
> in the patrol officer's side. Okay. He was looking for Reba
> Woods and looking for an opportunity to identify her. He's
> looking for an opportunity to pin some crimes on [her].

During the State's rebuttal closing argument, the prosecutor responded as follows:

This allegation that Detective Guyton has quote, "a thorn in his side and he's looking for an opportunity to pin crimes on Reba Woods." You don't have any evidence of that. That's what happens when there's no defense, you blame the police, you say they lied, they made things up and they're pinning something on somebody; that's not what happened in any way, that's not what happened.

It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). "The prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." State v. Garner Dwight Padgett, No. M2003-00542-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 938, at *34 (Nashville, Oct. 21, 2004).

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]
>
> (2) the curative measures undertaken by the court and the prosecution[;]
>
> (3) the intent of the prosecutor in making the statement[;]
>
> (4) the cumulative effect of the improper conduct and any other errors in the record[; and]
>
> (5) the relative strength or weakness of the case.

Id. at 368 (quoting Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

The appellant contends that the prosecutor improperly told the jury that defense

counsel referred to Detective Guyton as a liar and that defense counsel made up a nonexistent defense. However, defense counsel's statement that Detective Guyton was looking for an opportunity to "pin" some crimes on the appellant could have been construed as an accusation that the detective was falsely accusing the appellant of the crimes. Therefore, we do not consider the State's comments during rebuttal to be improper. In any event, the prosecutor's comments were brief, and there is no evidence she intended to unduly prejudice the appellant by her remarks. Moreover, the trial court instructed the jury during the jury charge that closing arguments were not evidence. See Millbrooks, 819 S.W.2d at 443. Therefore, we conclude that the appellant is not entitled to relief.

## K. Cumulative Errors

The appellant contends that the cumulative effect of the errors in this case deprived her of due process. However, we conclude that this claim has no merit.

## L. Sentencing

Finally, the appellant contends that her effective ninety-year sentence, which equates to a life sentence, constitutes cruel and unusual punishment and is disproportionate to the crimes. The State argues that the appellant's effective sentence does not constitute cruel and unusual punishment. We agree with the State.

At the appellant's sentencing hearing, no witnesses testified, but the State introduced into evidence her presentence report. According to the report, the then forty-nine-year-old appellant had several grown children. She dropped out of school after the eighth grade; began using marijuana when she was sixteen years old, alcohol when she was eighteen years old, and cocaine when she was twenty years old; and spent time in prison where she received treatment for her addictions. In the report, the appellant described her physical and mental health as good. The report shows that she worked for C&C Appliance "off and on" as a truck driver and laborer from 2003 to 2010. The report also shows that she has ten prior felony drug convictions, two prior misdemeanor drug convictions, and prior misdemeanor convictions for possession of a gambling device and forgery.

The trial court noted that the appellant was a Range III, career offender and, therefore, that her mandatory sentences were sixty years for the Class A felony convictions in counts 3, 4, and 5 and thirty years for the Class B felony convictions in counts 1 and 2, all to be served at 100%. The trial court stated that the appellant had an extensive criminal history and that she "hasn't worked much during her life, so evidence clearly suggests that [selling drugs] is the primary basis of her living, her financial resources." The trial court concluded that she had no chance at rehabilitation and found her to be a professional criminal,

warranting consecutive sentencing.  The trial court ordered that the appellant serve her three sixty-year sentences concurrently with each other and that she serve her two thirty-year sentences concurrently with each other but consecutively to the sixty-year sentences for a total effective sentence of ninety years at 100% in confinement.

Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness.  See Tenn. Code Ann. § 40-35-401(d). However, in State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012), our supreme court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'"  In determining a defendant's sentence, the trial court considers the following factors:  (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment.  See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98.  The burden is on the appellant to demonstrate the impropriety of her sentence.  See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Although the appellant contends that her effective ninety-year sentence constitutes cruel and unusual punishment, our Code requires that a career offender serve the maximum sentence within the applicable range, which in this case is sixty years for the Class A felonies and thirty years for the Class B felonies.  See Tenn. Code Ann. §§ 40-35-108(c), -112(c)(1), (2).  The appellant does not contest that she qualifies as a Range III, career offender.  Given the length of her criminal record for selling drugs, we conclude that there is no inference of "gross disproportionality" under the facts of this case.  See State v. Harris, 844 S.W.2d 601, 603 (Tenn. 1992).  Therefore, the trial court did not abuse its discretion in sentencing the appellant to an effective ninety years in confinement.

We note, though, that the trial court ordered that the appellant serve her sentences at 100%.[3]  However, Tennessee Code Annotated section 39-17-432(c) of the Drug-Free School Zone Act provides that

> Notwithstanding any other provision of law or the sentence
> imposed by the court to the contrary, a defendant sentenced for

---

[3]On the judgment of conviction forms, the trial court checked the box for 60% release eligibility but hand-wrote on the bottom of the forms that the sentences were to be served at 100%.

a violation of subsection (b) shall be required to serve at least the minimum sentence for the defendant's appropriate range of sentence. Any sentence reduction credits the defendant may be eligible for or earn shall not operate to permit or allow the release of the defendant prior to full service of the minimum sentence.

In other words, a defendant must serve only the minimum sentence in the range at 100%. Davis v. State, 313 S.W.3d 751 (Tenn. 2010). "Absent a plea bargain wherein a defendant surrenders the normal sentencing credits granted under the Sentencing Act, the Drug-Free School Zone Act requires application of release eligibility and sentence reduction credits to the portion of a defendant's sentence in excess of the statutory minimum sentence." Calvin Eugene Bryant, Jr., No. M2009-01718-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 897, at *61. Therefore, the appellant would be required to serve 40 years for the Class A felony convictions and 20 years for the Class B felony convictions at 100%, and then the appropriate release eligibility and sentence reduction credits would apply to the remaining years.

## III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court erred by failing to sever the offenses and that the error was not harmless as to the appellant's convictions in counts 3, 4, and 5. Therefore, those convictions are reversed, and the case is remanded to the trial court for new trials on those charges. We also conclude that although the evidence is sufficient to show that the appellant sold twenty-six grams or more of cocaine in counts 1 and 2, the evidence is insufficient to show that she did so within 1,000 feet of a park. Therefore, the case is remanded to the trial court for correction of those judgments. Finding no errors that warrant reversal of the appellant's convictions for selling twenty-six grams or more of cocaine in counts 1 and 2, those convictions are affirmed. However, the case is also remanded in order for the trial court to consider whether the appellant's mandatory thirty-year sentences for those convictions should be served consecutively.

_____
NORMA McGEE OGLE, JUDGE